**STANLEY et al. v. PEABODY COAL CO. et al.**

No. 1239.

District Court, S. D. Illinois, N. D.

Dec. 16, 1933.

Arthur Fitzgerald, of Springfield, Ill., Leal W. Reese, of Taylorville, Ill., George W. Dowell, of Du Quoin, Ill., Nobel Y. Dowell, of East Peoria, Ill., C. C. Dreman, of Belleville, Ill., D. W. Johnston, of Taylorville, Ill., and Oral P. Tuttle, of Harrisburg, Ill., for plaintiffs.

Thurlow G. Essington, George B. McKibbin, and Walter E. Beebe, all of Chicago, Ill., for defendants.

FITZHENRY, Circuit Judge.

Plaintiffs are twenty-two members of the Progressive Miners of America, a labor organization of comparatively recent origin. The individual plaintiffs sue, not only for themselves, but for all other members of their organization similarly situated, and seek to have the defendant corporations, engaged in the business of mining coal at various points in the Southern and Eastern Districts of Illinois, restrained from violating the provisions of the National Industrial Recovery Act (48 Stat. 195) and the Code of Fair Competition for the Coal Industry, established under the law, and agreed to by each of the defendant corporations.

It is claimed that defendants are displaying the Blue Eagle as an emblem of compliance with the provisions of the Code, and, notwithstanding that fact, are continuously

violating the Recovery Act and Code by endeavoring to compel the individual plaintiffs and others similarly situated to withdraw from the Progressive Miners of America and join a labor organization not of their own choosing; also, charging that the defendants have had meetings of their representatives in Chicago and Springfield and that they have formed a conspiracy to compel plaintiffs and others similarly situated to withdraw from the Progressives and join another organization, and have committed various overt acts, which are set out, to effect the object of the conspiracy.

Petitioners charge that many unfortunate instances have resulted in a so-called coal mining war in the state of Illinois within the last eighteen months, solely because of the conspiracy of defendants, which, though entered into before the enactment of the National Industrial Relief Act, "was carried on with increased activity after the passage of the Act and the adoption of the said Code," etc.; that the defendants have enough jobs to replace all of the petitioners and those similarly situated and thereby save the state of Illinois an expense of approximately $3,000 daily for the maintenance of soldiers in the counties of Sangamon, Christian, and Saline, in the state, and thereby relieve the state of Illinois and the federal government of the expenditure of thousands of dollars in caring for the miners and their families as measures of relief, etc..

The bill also charges that defendants' several acts complained of constitute an "aggravated nuisance," to the embarrassment of the people of the state and the United States, causing disrespect for law; that by reason of the public nuisance of the most aggravated type, plaintiffs have suffered special and peculiar injury by reason of loss of employment and their opportunity to work at their regular employment and thereby support themselves and their families; that they are denied their civil rights.

It is charged that if the injunctive relief sought is granted that the injury to defendants will be less than the injury to plaintiffs if it should not be granted; that they have no adequate remedy at law; that the United States district attorneys are unable, because of the great number of violations of the National Industrial Recovery Act, and others, being committed by these defendants and others, to promptly and effectively prevent the National Industrial Recovery Act from being violated, to the injury of the plaintiffs, etc., and by reason thereof they are unable and unwilling to prosecute the defendants named.

The bill affirmatively asserts plaintiffs have not failed to comply with any obligations imposed by law upon them in their endeavor to be replaced at their jobs; that they have made every reasonable effort to induce the defendants herein to comply with the terms of the National Recovery Act, and to permit these complainants to work for defendants and have their freedom of association, self-organization and designation of representatives of their own choosing, etc., and defendants "have constantly denied that your petitioners * * * are entitled to the right to belong to a labor union of their own choosing and have further denied that they are entitled to the right of their freedom of association," etc.

The prayer of the bill is for an injunction restraining defendants from "directly or indirectly interfering with, restraining or coercing your petitioners or others in like situation, from organizing or bargaining collectively through representatives of their own choosing, * * * and to further restrain them from employing any additional persons to take the jobs of your petitioners; and that the defendants herein be further enjoined from displaying the Blue Eagle, the insignia of their compliance with the National Industrial Recovery Act, until your petitioners and others in like situation shall be replaced in their respective jobs and permitted to belong to a labor organization of their own choosing, *or from continuing to operate their several coal mines until such time as they shall comply with the provisions of the National Recovery Act and Bituminous Coal Code, and shall permit your petitioners and others in like situation to return to their jobs and be permitted to join* * * * *the Progressive Miners of America* * * *."*

Each of the defendants entered its limited appearance for the purpose of making a motion to dismiss for want of jurisdiction, and under the limited appearance presented its motion. The cause came on to a hearing upon the original bill and a motion for a temporary restraining order, supported by seven affidavits attached to the original bill, exclusive of four affidavits executed by eighteen of the plaintiffs concerning the matters of fact alleged in the bill of complaint. Upon the hearing no witnesses were presented in open court. The court held that the controversy disclosed by the bill was a labor dispute within the terms and provisions of the act enti-

tled, "An Act to amend the Judicial Code and to define and limit the jurisdiction of courts sitting in equity, and for other purposes," commonly known as the Norris Anti-Injunction Act (29 USCA §§ 101–114 inc., Act of March 23, 1932, c. 90, § 13, 47 Stat. 70, 29 USCA § 113) and the motion for a temporary restraining order was denied.

The motion of defendants upon their limited appearance was also heard and plaintiffs took leave to file their amended bill. The limited appearance of defendants and their motion to dismiss were extended to the amended bill; the substantial component parts of which are disclosed in the foregoing statement.

The specific reasons assigned by the defendants in support of their motion to dismiss for want of jurisdiction are:

1. That the application is not made nor is the said bill filed by the district attorney of the United States in the Northern Division of the Southern District of Illinois, or under the direction of the Attorney General of the United States.

2. Under the National Industrial Recovery Act this court has no jurisdiction of the parties or of the subject-matter contained in the bill in the form in which the said bill is filed.

3. The said bill, as drawn and presented, is contrary to the intent and spirit of the National Industrial Recovery Act, and the relief prayed for in the bill, if granted, will defeat the purpose of such act. The bill is based solely upon the National Industrial Recovery Act and sets up no grounds for jurisdiction of the court.

It is clear that plaintiffs are depending upon the National Industrial Recovery Act to sustain the jurisdiction of this court in this case. Section 1 (15 USCA § 701) is a declaration of policy; section 2 (15 USCA § 702) creates the administrative agencies; section 3 (15 USCA § 703) provides for codes of fair competition; section 4 (15 USCA § 704) provides for agreements and licenses; section 5 (15 USCA § 705) suspends the provisions of the Anti-Trust Laws of the United States while the Recovery Act is in force and effect and for sixty days thereafter as to any Code, agreement, or license approved by the President; section 6 (15 USCA § 706) defines the limitations of the act and reserves the services of the Federal Trade Commission to assist in carrying out the provisions of the act, upon the request of the President; section 7, paragraph (a) (15 USCA § 707 (a), is the portion of the act which

plaintiffs contend has been violated and which will hereafter be discussed; section 8 (15 USCA § 708) is applicable to agricultural adjustment; section 9 (15 USCA § 709) oil regulations; and section 10 (15 USCA § 710) provides for rules and regulations.

It was the purpose of Congress in enacting section 3 to prescribe, in a general way, what was to be contained in the Codes submitted to the President for his approval. Paragraph (b), 15 USCA § 703 (b) provides that after the President has approved any Code, the provisions of such Code shall be the standard of fair competition in the particular industry involved.

Paragraph (c), 15 USCA § 703 (c), contained the following language: "The several district courts of the United States are hereby invested with jurisdiction to prevent and restrain violations of any code of fair competition approved under this title; and it shall be the duty of the several district attorneys of the United States, in their respective districts, under the direction of the Attorney General, to institute proceedings in equity to prevent and restrain such violations."

Paragraph (f) of section 3, 15 USCA § 703 (f), provides the penalty for violations of the Code of Fair Competition, saying: "When a code of fair competition has been approved or prescribed by the President under this chapter, any violation of any provision thereof in any transaction in or affecting interstate or foreign commerce shall be a misdemeanor and upon conviction thereof an offender shall be fined not more than $500 for each offense, and each day such violation continues shall be deemed a separate offense."

It is a singular fact that the Industrial Recovery Act provides no penalty for the violation of the act. The only crimes denounced in the act are for: (1) Violating a Code approved by the President; and, (2) for violating the rules and regulations prescribed by the President to carry out the purposes of the act.

Under the authority of the National Industrial Recovery Act, the Code of Fair Competition for the Bituminous Coal Industry was submitted and approved by the President and accepted by the industry. Article V, paragraph (a), puts into the Code the provisions required by paragraph (a) of section 7 of the act (15 USCA § 707 (a), which provides: "(1) That employees shall have the right to organize and bargain collectively through representatives of their own choosing, and shall be free from the interference, restraint, or coercion of employers of labor,

or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection; (2) that *no employee and no one seeking employment shall be required as a condition of employment to join any company union or to refrain from joining, organizing, or assisting a labor organization of his own choosing;* and (3) that employers shall comply with the maximum hours of labor, minimum rates of pay, and other conditions of employment, approved or prescribed by the President." (Italics inserted.)

It is the alleged violation of phrase (2) which plaintiffs herein seek to have restrained.

Article VII provides for the Bituminous Code Labor Boards and the field is divided into five divisions, Illinois being in Division II. A Bituminous Coal Labor Board is provided for in each of the five divisions of the industry (except Division I, where there are two boards), each consisting of three members. The National Bituminous Coal Labor Board is composed of members of the six Divisional Boards and the Board may be convened as provided in the Code. These various Boards to exercise jurisdiction over labor controversies, as provided in section 5 of article VII, in paragraphs (a) and (b):

"Labor Regulations.—(a) any controversy concerning hours, wages, and conditions of employment, or compliance with the provisions of Article V of this Code, *between employers and employees who are organized or associated for collective action, shall, if possible, be adjusted by conference and negotiation between duly designated representatives of employers and such employees, meeting either in a mine conference or district conference or divisional conference,* as the machinery for such conference may be established by agreement of the parties hereto; *and it shall be the duty of employers and employees to exert every reasonable effort to establish such a machinery* of adjustment and to utilize it to negotiate to a conclusion such controversies wherever possible.

"(b) Any such controversy which cannot be settled in the manner so provided and which threatens to interrupt, *or has interrupted, or is impairing the efficient operation* of any mine or mines to such an extent as to restrain interstate commerce in the products thereof, shall be referred to the appropriate *Bituminous Coal Labor Board,* established as hereinafter provided, and the decision of said Board shall be accepted by the parties to the controversy as effective for a provisional period of not longer than six months, to be fixed by the Board." (Italics inserted.)

The National Industrial Recovery Act and the Code of Fair Competition for the Bituminous Coal Industry provide the means for the administration of the act and the enforcement of Codes of Fair Competition promulgated under it, for settling controversies between employers and employees relative to organization and collective bargaining. The settlement of controversies must be submitted for consideration to the Bituminous Coal Labor Board for the division of the industry in which the dispute might arise. In the event of its unsuccessful composition of the difficulties, an appeal is provided to the National Bituminous Coal Labor Board to have the Division Board's decision reviewed, and either affirmed, set aside or modified.

Paragraph (c) of section 3 of the National Industrial Recovery Act (15 USCA § 703 (c), which gives the District Courts of the United States jurisdiction to prevent and restrain violations of any Code of Fair Competition, provides: "and it shall be the duty of the several district attorneys of the United States, in their respective districts, under the direction of the Attorney General, to institute proceedings in equity to prevent and restrain such violations."

In construing the force and effect of the provisions of paragraph (c), an examination of the Sherman Anti-Trust Law (15 USCA §§ 1–7, 15 note), is persuasive of the fact that the words used in paragraph (c) were advisedly used by the Congress for the reason they are the precise language used in section 4 of the Anti-Trust Act (15 USCA § 4) except in so far as in the latter act its applicability is made to certain specific sections of the Anti-Trust Law.

There is no provision in the National Industrial Recovery Act, nor does it authorize a provision to be placed in any Code, giving the right to any private individual to institute proceedings to compel obedience to the act itself or a Code promulgated under it.

In discussing the force and effect of section 4 of the Sherman Anti-trust Law (15 USCA § 4), the United States Supreme Court, in Minnesota v. Northern Sec. Co., 194 U. S. 48, 24 S. Ct. 598, 604, 48 L. Ed. 870, said: "We cannot suppose it was intended that the enforcement of the act should depend in any degree upon original suits in equity instituted by the states or by individuals to prevent violations of its provisions. On the contrary, taking all the sections of that act together,

we think that its intention was to limit direct proceedings in equity to prevent and restrain such violations of the anti-trust act as cause injury to the general public, or to all alike, merely from the suppression of competition in trade and commerce among the several states and with foreign nations, to those instituted in the name of the United States, under the 4th section of the act, by district attorneys of the United States, acting under the direction of the Attorney General; thus securing the enforcement of the act, so far as direct proceedings in equity are concerned, according to some uniform plan, operative throughout the entire country."

The same rule was applied in D. R. Wilder Mfg. Co. v. Corn Products Co., 236 U. S. 165, 174, 35 S. Ct. 398, 401, 59 L. Ed. 520, Ann. Cas. 1916A, 118. In that case the court said:

"Thus the statute expressly cast upon the Attorney General of the United States the responsibility of enforcing its provisions, making it the duty of the district attorneys of the United States, in their respective districts, under his authority and direction, to act concerning any violations of the law. And in addition, evidently contemplating that the official unity of initiative which was thus created to give effect to the statute required a like unity of judicial authority, the statute in express terms vested the circuit court of the United States with 'jurisdiction to prevent and restrain violations of this act.' * * *

"It is true that there are no words of express exclusion of the right of individuals to act in the enforcement of the statute, or of courts generally to entertain complaints on that subject. But it is evident that such exclusion must be implied for a twofold reason: First, because of the familiar doctrine that 'where a statute creates a new offense and denounces the penalty, or gives a new right and declares the remedy, the punishment or the remedy can be only that which the statute prescribes.' "

The holdings in Minnesota v. Northern Sec. Co., supra, and Wilder Mfg. Co. v. Corn Products Co., supra, were again applied by the Supreme Court in General Investment Co. v. Lake Shore & Mich. S. R. Co., 260 U. S. 261, 143 S. Ct. 106, 116, 67 L. Ed. 244. This case was decided after the passage of the Clayton Act (38 Stat. 730), which supplemented the rights of parties under the Sherman Anti-Trust Act (15 USCA §§ 1–7, 15 note). In the latter case the court said: "As respects the Sherman Anti-Trust Act as it stood before it was supplemented by the Clayton Act, this court has heretofore determined that the civil remedies specially provided in the act for actual and threatened violations of its provisions were intended to be exclusive and that those remedies consisted only of (a) suits for injunctions brought by the United States in the public interest under section 4 [15 USCA § 4], and (b) private actions to recover damages, brought under section 7 [15 USCA § 15 note]. * * * The present suit for an injunction, brought by a private corporation in its own interest, was not within those remedies, and so could not be maintained under that act standing alone."

In Paine Lumber Co. v. Neal, 244 U. S. 459, 37 S. Ct. 718, 719, 61 L. Ed. 1256, the Supreme Court used this language: "In the opinion of a majority of the court, if the facts show any violation of the Act of July 2, 1890, c. 647, 26 Stat. 209, Comp. St. 1916, § 8820 [15 USCA § 1], a private person cannot maintain a suit for an injunction under section 4 of the same; * * * and especially such an injunction as is sought; even if we should go behind what seems to have been the view of both courts below, that no special damage was shown, and reverse their conclusion of fact."

From a consideration of the construction placed upon the precise words used in paragraph (c) of section 3 of the National Industrial Recovery Act, 15 USCA § 703 (c), when those words were used in section 4 of the Anti-Trust Act (15 USCA § 4), we are compelled to hold that a private individual cannot maintain a suit for an injunction under paragraph (c) of section 3.

Plaintiffs seriously contend that because the act and the Code in question give to employees of others the right of collective bargaining and prohibit employers of labor, as a condition of employment, from requiring applicants to join a company union, and also providing as such condition that such employees shall refrain from joining, organizing, or assisting a labor organization of their own choosing, and because of these rights given to labor by the National Industrial Recovery Act, and because it is charged that plaintiffs and others similarly situated are in fact the employees of the defendants, that they are denied the enjoyment of their individual rights; and because they have no remedy at law, that equity has jurisdiction to grant them the relief prayed. It would seem that the expression of the United States Supreme Court in Wilder Mfg. Co. v. Corn Products Co., supra, would be sufficient to settle these questions: "Where a statute creates a new offense and denounces the penalty, or gives a new right

and declares the remedy, the punishment or the remedy can be only that which the statute prescribes."

It must be borne in mind that the National Industrial Recovery Act provides no remedy in equity for the preservation of alleged private rights, such as it is contended are here involved.

The act and Code, however, do provide specific remedies for situations such as are shown by plaintiffs' bill. The Code provides, first, for voluntary conferences; second, for recourse to the Bituminous Coal Labor Board; and, third, should the award of the Labor Board be unsatisfactory, an appeal to the National Bituminous Coal Labor Board. This latter board has power to review, modify, affirm, or set aside the award of a Bituminous Coal Labor Board, as justice may require.

■ Had this case been submitted to the Bituminous Coal Labor Board, that body, the appropriate one, would have made an order adjusting the matter, making its decision effective for a provisional period. Had the alleged controversy been taken before the Bituminous Coal Labor Board, and its decision unsatisfactory, an appeal could have been prosecuted to the National Bituminous Coal Labor Board, and the facts should have been affirmatively averred in the bill, for in no event can a controversy of this kind be taken into the courts until such remedies as are provided have been exhausted. Such has been the holding of the United States Supreme Court construing the Interstate Commerce Act (49 USCA § 1 et seq.), the Sherman Anti-Trust Act (15 USCA § 1–7, 15 note), and the Shipping Act (46 USCA § 801 et seq.). Probably the latest discussion of the subject by the Supreme Court was in United States Navigation Co., Inc., v. Cunard Steamship Co., Limited, 284 U. S. 474, 52 S. Ct. 247, 249, 76 L. Ed. 408.

In that case the plaintiff navigation company, which operates ships in foreign commerce, brought its suit to enjoin respondents, the Cunard Steamship Company, Limited, and a number of other companies, from continuing an alleged combination and conspiracy in violation of the Sherman Anti-Trust Act. The District Court [39 F.(2d) 204] dismissed the bill for the reason that the matters complained of were within the exclusive jurisdiction of the United States Shipping Board, under the Shipping Act of 1916, c. 451, 39 Stat. 728, as amended by the Merchant Marine Act of 1920, c. 250, 41 Stat. 988

(46 USCA §§ 801 to 842). The Circuit Court of Appeals affirmed the order of the District Court. 50 F.(2d) 83.

Briefly stated, the plaintiff in that case was endeavoring to enjoin the respondent corporations, who were also engaged in foreign commerce between the United States and specified foreign countries, and carrying 95 per cent. of the general cargo trade from North American ports in the United States to the ports of Great Britain and Ireland. These corporations and the plaintiff were the only lines maintaining cargo service in that trade. It was charged that respondents had entered into and are engaged in a combination and conspiracy to restrain foreign trade and commerce in respect to the carriage of general cargo from the United States to the foreign ports named, with the object and purpose of driving the petitioner and all others not parties to the combination out of, and from monopolizing, such trade and commerce. The alleged conspiracy involved the establishment of a general tariff rate and a lower contract rate, the latter to be made available only to shippers who agreed to confine their shipments to the lines of the respondents. The differentials thus created between the two rates were not predicated upon the volume of traffic, or frequency or regularity of shipment, but were purely arbitrary and wholly disproportionate to any difference in service rendered, the sole purpose being to coerce shippers to patronize respondents and not patronize the ships of plaintiff, thus intending to drive the plaintiff company entirely from the carrying trade between the United States and Great Britain. The court said: "It may be conceded that looking alone to the Sherman Anti-Trust Act the bill states a cause of action under sections 1 and 2 of that act (15 USCA §§ 1, 2) and consequently furnishes ground for an injunction under section 16 of the Clayton Act (15 USCA § 26) unless the Shipping Act stands in the way; and this was the view of both courts below." In the body of the opinion the court used this language: "A comparison of the enumeration of wrongs charged in the bill with the provisions of the sections of the Shipping Act above outlined conclusively shows, without going into detail, that the allegations either constitute direct and basic charges of violations of these provisions, or are so interrelated with such charges as to be, in effect, a component part of them; and the remedy is that afforded by the Shipping Act, which to that extent supersedes the anti-trust laws. Compare Keogh v. C. & N. W.

Ry. Co., supra, 260 U. S. at page 162, 43 S. Ct. 47, 49, 67 L. Ed. 183. The matter therefore is within the exclusive preliminary jurisdiction of the Shipping Board. The scope and evident purpose of the Shipping Act, as in the case of the Interstate Commerce Act, is demonstrative of this conclusion. Indeed, if there be a difference, the *conclusion as to the first-named* act rests upon stronger ground, since the decisions of this court compelling a preliminary resort to the Commission were made in the face of a clause in section 22 of the Interstate Commerce Act (49 USCA § 22) that nothing therein contained should in any way abridge or alter *existing common-law or statutory remedies, but that the provisions of the act were in addition to such remedies* (Mitchell Coal Co. v. Penna. R. R. Co., 230 U. S. 247, 256, 33 S. Ct. 916, 57 L. Ed. 1472); a clause that finds no counterpart in the Shipping Act." (Italics inserted.)

We might also say, parenthetically, that there is nothing in the National Industrial Recovery Act or the Bituminous Coal Code of Fair Competition which militates against a similar construction of the act and the Code. We might also add that there is no provision in the National Industrial Recovery Act which is the counterpart of the reservation of private rights in the Interstate Commerce Act.

In the Cunard Co. Case, supra, the United States Navigation Company was seeking to enjoin the respondents from annihilating its business by a combination in restraint of trade, made and entered into in violation of the Anti-Trust Laws. The bill in that case alleged a gross violation of private rights and exhibited a substantial equity.

From the affidavits attached to the original bill in this case, and which are a part of the record, it is disclosed that each of the defendant corporations is operating its coal mine under contract with the United Mine Workers of America. By the amended bill it is established that there has existed open warfare in the bituminous coal fields of Illinois between the members of that organization and the members of the Progressive Miners of America, of which the plaintiffs here are members, and that condition existed for more than eighteen months. It is common knowledge that some of the mines are being operated under similar contracts with the latter organization; that by reason of this open warfare there has been loss of life, great damage to private property, and the public safety has been impaired to the extent it has been necessary for the Governor to call out the Militia to maintain the public peace. Under these circumstances there is a grave question as to whether or not the plaintiffs and others similarly situated were employees of the defendants at the time of the filing of the original bill, within the meaning of the Recovery Act, which, of course, would be one of the important things to be decided by the Bituminous Coal Labor Board before it could presume to act.

The so-called Norris Act prohibits the granting of the injunctive relief growing out of a labor dispute to any complainant who has failed to comply with any obligation imposed by law which is involved in the labor dispute in question, or who has failed to make every reasonable effort to settle either by negotiation or with the aid of any governmental machinery of mediation or voluntary arbitration. (29 USCA § 108).

There is no allegation in the bill of complaint in this case that the governmental machinery has been exhausted and particularly the machinery created by the Bituminous Coal Code of Fair Competition. There is, however, a general allegation that the plaintiffs have done everything in their power to effect a voluntary and friendly adjustment of their differences with the respondents. This, however, is but the conclusion of the pleader.

The court realizes that in form this is an action on the part of citizens to compel the defendant corporations to live up to the provisions of the Bituminous Coal Code, which plaintiffs claim the defendants have been violating. Yet it is a fair deduction to make from the allegations in the bill that it is in fact a labor dispute, within the meaning of the Norris Act.

In the light of these considerations, the motion to dismiss plaintiffs' amended bill must be allowed. And it is so ordered.