**PROGRESSIVE MINERS OF AMERICA LOCAL UNION NO. 109 et al. v. PEABODY COAL CO. et al.**

No. 4629.

District Court, E. D. Illinois.
May 7, 1934.

George W. Dowell, of DuQuoin, Ill., Oral Tuttle, of Harrisburg, Ill., Leal Reese and D. W. Johnston, both of Taylorville, Ill., C. C. Dreman, of Belleville, Ill., and Nobel Y. Dowell, of East Peoria, Ill., for plaintiffs.

Walter E. Beebe and Thurlow G. Essington, both of Chicago, Ill., and Gillespie, Burke & Gillespie, of Springfield, Ill., for defendants.

WHAM, District Judge.

This case is now before the court solely upon the questions raised by the motions filed

by the defendants under special and limited appearances for that purpose only, to dismiss plaintiffs' amended bill for want of necessary parties, and for want of jurisdiction. For the purpose of disposing of said motions, all of the well-pleaded allegations of the plaintiffs' bill, as amended, will be taken as true except the allegation that the defendant Peabody Coal Company executed the President's re-employment agreement and the allegation relating thereto set forth in paragraphs 8 to 12 of the bill, as amended, which, I understand, is not now insisted upon by plaintiffs as being true.

By their amended bill the plaintiffs, Progressive Miners of America, Local Unions No. 109 and No. 113, seek to secure and have protected in them and their members certain rights alleged to have accrued to them as alleged employees of the defendant Peabody Coal Company by virtue of the provisions of the National Industrial Recovery Act (15 USCA §§ 701–712), hereinafter sometimes referred to as the act, and the Bituminous Coal Code of Fair Competition, promulgated thereunder, hereinafter sometimes referred to as the code, and particularly through section 7 (a) of said act, 15 USCA § 707 (a) and article V (a) of said code.

Counsel for the plaintiffs say further that the bill, as amended, contains allegations of facts giving rise to rights in the plaintiff under the Constitution of the United States, under the interstate commerce laws of the United States, and under the public policy of the nation as declared by statute, which are sufficient to form a basis for relief and to give the court jurisdiction, without reliance upon the provisions of the said act and in the absence of diversity of citizenship. Diversity of citizenship between the parties plaintiff and defendant does not appear from the allegations of the bill, as amended.

The allegations of the bill, in so far as necessary to be noticed in order to determine the questions before the court, are, in substance, as follows: That the defendant Peabody Coal Company owns and operates bituminous coal mines known as mines No. 43 and No. 47, located at Harrisburg and Harco, Saline county, Ill.; that it maintains coal-selling agencies in numerous states, produces and markets coal in vast quantities, and is engaged in business affecting and constituting interstate commerce subject to the laws governing interstate commerce; that the United Mine Workers of America is an unincorporated association, having its principal offices in Indianapolis, Ind., and Washington, D.

C., in which cities its principal officers reside; that it is international in scope, divided into districts, subdistricts, and local unions; that prior to November, 1932, it maintained Local Union No. 1910 at said mine No. 43 and Local Union No. 4 at said mine No. 47, both in subdistrict No. 11 of district No. 12 of said United Mine Workers of America; that since said date said district, subdistrict, and locals of said United Mine Workers of America have been provisional only, manned by the provisional officers who are named among the defendants in this suit; that prior to November, 1932, the employees of Peabody Coal Company's mines Nos. 43 and 47 were members of the United Mine Workers of America, but at that time withdrew from that organization, and in February, 1933, became affiliated with the Progressive Miners of America and members of its Local Union No. 113 at mine No. 43 and Local Union No. 109 at mine No. 47, the plaintiffs herein; that, as members of said organization and said locals, they chose as their representatives to represent them in collective bargaining with their employer, the Peabody Coal Company, officials of the Progressive Miners of America, and have at all times since then been represented by their said chosen representatives and not by the provisional officials of the United Mine Workers of America; that, when their said chosen representatives, under their direction, approached their employer, the defendant Peabody Coal Company, the said company refused to recognize them and refused to permit the plaintiffs to work unless they first reunited with the United Mine Workers of America; that the officials of the said United Mine Workers of America and the Peabody Coal Company, through its officials, have conspired and confederated together, and are continuing so to do, to force the plaintiffs to reunite with the United Mine Workers of America and pursuant to said conspiracy have committed and threaten to commit various overt acts, set forth in detail in the amended bill, calculated to force the plaintiffs, in order to obtain employment, to reunite with the United Mine Workers of America and give up their right to belong to any organization of their own choosing and to be represented by representatives of their own choosing.

The amended bill then sets up section 7 (a) of the National Industrial Recovery Act (15 USCA § 707 (a), and alleges that pursuant thereto there was promulgated by the President of the United States, on or about the 18th day of September, 1933, a Code of Fair Competition for the Bituminous Coal

342

Industry; that the Peabody Coal Company subscribed and agreed to said code, including article V (a) thereof.

It is further alleged that, despite repeated and persistent verbal and written demands by the said chosen representatives of the plaintiffs made upon the Peabody Coal Company that the plaintiffs, employees of said company at said mines, be given employment in said mines Nos. 43 and 47, and be given the right to have an organization and representation of their own choosing, the said defendant Peabody Coal Company has refused and persists in refusing to recognize the chosen representatives of the plaintiffs and refused and persists in refusing to re-employ the plaintiffs except upon condition that they reunite with the United Mine Workers of America; that the said actions of the defendants are in violation of the provisions of the said act and the said code and operate to deprive the plaintiffs of their right to employment and to organize and bargain collectively through representatives of their own choosing.

It is further alleged in the amended bill that the Bituminous Coal Labor Board for Division No. 2, which has jurisdiction over Illinois, Indiana, and Iowa, consisted of three members; that it had as one of its members, as the employees' representative on the board, one Ora Gasaway of Indiana, who, at the same time, was an International Board member of the United Mine Workers of America; that said board had as another member, representing employers, J. Harvey Cartwright of Indiana, former official of the United Mine Workers of America, now secretary of the Indiana Coal Producers' Association; that these two members of the board of three represented interests directly opposed to the recognition of the rights of the plaintiffs to be employed by the defendant Peabody Coal Company and to belong to an organization of their own choosing with representatives of their own choosing; that nevertheless the plaintiffs, having no other remedy, were compelled to and did submit to said board their controversy with the defendants as above set forth; that the hearing before said board was a farce and unfair; that the witnesses were not sworn; that said board rendered a decision against the plaintiffs that was contrary to the law and the evidence and included in its decision matters that were not before it for determination; that as a part of the conspiracy against the plaintiffs the shorthand reporter who reported the hearing delayed in preparing and furnishing a transcript of the proceedings and when furnished

the transcript was garbled and meaningless; that plaintiffs perfected an appeal from said decision of the Divisional Bituminous Coal Labor Board to the National Bituminous Coal Labor Board, composed of eighteen members, but it likewise decided against the contentions of the plaintiffs after a hearing and having taken the matter under advisement; that, while considering the decision, the board permitted a brother of the International President of the United Mine Workers of America and an attorney for that organization to remain in the room, and, as a further part of said conspiracy, seven hours before the board announced its decision, the defendant William Sneed conveyed information to newspapers in Taylorville, Ill., controlled by the defendant Peabody Coal Company, that said board had rendered a unanimous decision against the employees of Peabody mines Nos. 43 and 47; that during said seven-hour period representatives of said employees were being continuously informed that the board had not made a decision.

The bill, as amended, further alleges that the plaintiffs thereafter sought by letter to the Attorney General of the United States to get him to direct the proper district attorney to institute proceedings in equity to restrain defendants from violating the provisions of the said act and the said code, but the Attorney General refused to comply with this request; that by reason of the fraud and conspiracy on the part of defendants as set forth in the bill, as amended, the plaintiffs and other employees of the Peabody Coal Company whom plaintiffs represent have been denied their rights under the said act and code, denied the right to have their complaint adjudicated before a disinterested and fair tribunal, denied the equal protection guaranteed by the Constitution of the United States, and have been subjected to discrimination; that plaintiffs have been deprived of employment to which they are entitled; that, by reason of the facts complained of, one of said mines has been kept idle, thus interfering with interstate commerce and with the economic rehabilitation of the coal industry; that defendants have persisted in and threaten to continue their wrongs toward the plaintiffs; that the plaintiffs have exhausted all their remedies under the provisions of the said act and under the said code and through the United States district attorneys and the Attorney General who refuse to act; that the plaintiffs and the public will suffer great and irreparable injury and loss unless relief can be obtained through this court.

Plaintiffs seek an order restraining defendants from carrying out any plan or conspiracy to deprive employees of Peabody Coal Company of or interfere with their right to organize and bargain collectively through representatives of their own choosing, from violating the said code, public policy, or the Constitution of the United States. There is also a prayer that the Peabody Coal Company be required to re-employ its said employees without infringing their said rights, that the said orders of the said Divisional and National Labor Boards be set aside and for other relief.

A study of the bill, as amended, in the light of briefs filed by counsel, fails to disclose therein any cause of action for affirmative relief, arising outside the provisions of the National Industrial Recovery Act and the Code of Fair Competition for the Bituminous Coal Industry promulgated thereunder. Neither have counsel for the plaintiffs been able, as I read their briefs and recall their arguments, persuasively to point out the statement of any such cause of action. The allegations of the bill, as amended, do not state a cause of action under any existing law governing interstate commerce nor bring any phase of the controversy within the field of interstate commerce as defined by the United States Supreme Court. Levering & Garrigues v. Morrin, 289 U. S. 103, 53 S. Ct. 549, 77 L. Ed. 1062; Heisler v. Thomas Colliery Co., 260 U. S. 245, 43 S. Ct. 83, 67 L. Ed. 237. Only by reason of the provisions of said act and code can it be reasonably contended that the plaintiffs have an actionable right to be employed by the defendant Peabody Coal Company or to insist that it deal with them through an organization or through representatives of their own choosing or to complain of any dealings between or among the Peabody Coal Company and the other defendants concerning employment.

The National Industrial Recovery Act gives rise to certain rights of collective bargaining in employees as against their employers by the simple device of requiring those rights to be provided for in every code, agreement, or license approved or prescribed under the act. It is the approval of the code by the President that brings these rights into life. The particular rights here sought by the plaintiffs are specified in section 7 (a) of the act (15 USCA § 707 (a), and pursuant to its requirements are contained in article V(a) of the code in the same language as follows:

"(a) Employees shall have the right to organize and bargain collectively through representatives of their own choosing, and shall be free from the interference, restraint, or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection; (2) no employee and no one seeking employment shall be required as a condition of employment to join any company union or to refrain from joining, organizing, or assisting a labor organization of his own choosing; and (3) employers shall comply with the maximum hours of labor, minimum rates of pay, and other conditions of employment approved or prescribed by the President."

This is a private suit brought by the plaintiffs to restrain alleged violations of and an alleged conspiracy on the part of defendants to violate section 7 (a) of the act and the provisions of article V (a) of the code, which violations and conspiracy are alleged to affect both the private rights of the plaintiffs and public rights as well. Plaintiffs contend that this court, by virtue of the jurisdiction with which it is invested by the provisions of section 3 (c) of the act (15 USCA § 703 (c), has jurisdiction of this suit, brought as above stated. Section 3 (c) reads as follows:

"(c) The several district courts of the United States are hereby invested with jurisdiction to prevent and restrain violations of any code of fair competition approved under this chapter; and it shall be the duty of the several district attorneys of the United States, in their respective districts, under the direction of the Attorney General, to institute proceedings in equity to prevent and restrain such violations."

The defendants contend that the court is without jurisdiction in this suit, as brought, under the National Industrial Recovery Act, for the reason that the only jurisdiction conferred by the act upon this court is that given by said section 3 (c) which can be invoked only by a United States district attorney under the direction of the Attorney General.

Closely interwoven with the question of jurisdiction and the proper construction to be placed upon section 3 (c) is the question, discussed at length in the briefs and going to the very right of the plaintiffs to maintain their case, as to whether or not the remedy provided in the code for the wrongs of which the plaintiffs complain is their exclusive remedy beyond which they have no recourse.

The answer to these questions and contentions must be found within provisions of the

said act and the code promulgated thereunder, in the light of general principles of law, procedure, and statutory construction.

An examination of the act discloses that it is strictly emergency legislation limited in existence to a maximum period of two years. Enacted with a view to furnishing lawful authority whereby the President might more effectively move to cope with the economic and industrial crisis, then confronting the nation and the world, it created and placed in the hands of the President unusual powers hereinafter noticed, with authority to appoint agents and establish agencies necessary to effectuate its policy and to delegate his functions and powers under the act to officers, agents, and employees designated by him. It provides for the establishment of codes of fair competition to govern various trades and industries, to become effective only upon approval by the President, with the power in the President to impose such conditions and exceptions as he may deem necessary to effectuate the policy in the statute declared as a condition of his approval. It authorizes the President upon complaint, after hearing, to prescribe and approve codes for trades and industries for which none has been approved. It authorizes him to enter into and approve agreements with and among persons and organizations engaged in trade, labor, and industry; to set up codes of fair competition in certain instances and if necessary to license businesses. It gives him final power, within the law, to suspend or revoke such licenses after opportunity for hearing and imposes penalties for carrying on a business without a license whenever a license is so required. It exempts from the provisions of the anti-trust laws of the United States any action complying with provisions of codes, agreements, and licenses approved and issued under the act. By section 7 (a) quoted above, the act requires every code issued or approved under the act to be conditioned so as to secure to employees the right of collective bargaining through representatives of their own choosing. Section 10 of the act (15 USCA § 710) provides:

"(a) The President is authorized to prescribe such rules and regulations as may be necessary to carry out the purposes of this chapter, and fees for licenses and for filing codes of fair competition and agreements, and any violation of any such rule or regulation shall be punishable by fine of not to exceed $500, or imprisonment for not to exceed six months, or both.

"(b) The President may from time to time cancel or modify any order, approval, license, rule, or regulation issued under this chapter; and each agreement, code of fair competition, or license approved, prescribed, or issued under this chapter shall contain an express provision to that effect."

Other powers are given the President by the provisions of the act, but those specified above are sufficient in a general way to indicate the unusual nature of the authority placed in his hands. In a broad sense it is purely an administrative measure, to a limited extent and somewhat by common consent of those directly affected, placing under the president's control the nation's industrial and trade activities. It was obviously intended and effectually provided that the act should be administered solely by the President and by those answerable directly to him. To that end he is authorized to call upon, co-operate with, and institute proceedings before certain established governmental agencies such as the Federal Trade Commission, the United States Tariff Commission, and the Interstate Commerce Commission. To render the codes enforceable through the courts, the act prescribes penalties for violations thereof, and said section 3 (c) confers jurisdiction upon the United States District Courts to prevent and restrain violations of the codes and makes it the "duty of the several district attorneys of the United States, in their respective districts, under the direction of the Attorney General, to institute proceedings in equity to prevent and restrain such violations."

The Code of Fair Competition for the Bituminous Coal Industry, duly adopted by the industry and approved by the President, not only covers in detail the relations and terms and conditions of employment between employees and employers, including the rights of employees to organize and bargain collectively through representatives of their own choosing, but provides for the determination of such rights and the settlement and decision of controversies concerning such rights by setting up complete machinery for that purpose to be used if such differences cannot be composed through negotiations. That this may be clearly seen, sections 5 (d) to 5 (f), inclusive, of article VII, are here set forth:

"(d) If any such controversy shall involve or depend upon the determination of who are the representatives of the employees chosen as provided in Section 7 (a) of the National Industrial Recovery Act, the appropriate Bituminous Coal Labor Board, through any agent or agency it may select, shall have

the power to determine the questions by an investigation and, if necessary, by a secret ballot taken under its direction.

"(e) A Bituminous Coal Labor Board shall be appointed by the President for each Division, except there shall be two Boards for Division No. I, to exercise the powers herein conferred upon it, which shall consist of three members, one to be selected from nominations submitted by organizations of employees within such Division, one to be selected from nominations by the Divisional Code Authority and one who shall be wholly impartial and disinterested representative of the President. The expenses of such board shall be met by equal contributions from the employers and employees nominating members, the amount and method of collecting which shall be determined by regulations prescribed by the President.

"(f) There shall be a National Bituminous Coal Labor Board composed of the members of the six divisional labor boards which may be convened upon call of the Administrator in the event that—

"1. A controversy involves employers and employees of more than one division, or

"2. The decision of a divisional labor board affects operating conditions of more than one division either directly or because of its effect upon competitive marketing, or

"3. In the opinion of the Administrator the decision of a divisional labor board involves the application of a policy affecting the general public, or the welfare of the industry as a whole.

"The National Bituminous Coal Labor Board may exercise all the powers conferred upon a divisional labor board, either in giving original consideration to a controversy, or in reviewing the decision of a divisional labor board, which may be either affirmed, set aside and/or modified."

It was evidently foreseen by the President and the framers of the code that controversies over employees' rights of organization and representation, which is the specific controversy here involved, would arise as a natural sequence of the administration of the codes. Specific and complete provision for the determination thereof was made by giving original jurisdiction over such controversies as could not be settled by negotiations to the Divisional Bituminous Coal Labor Board and both original and appellate jurisdiction therein to the National Bituminous Labor Board. It will be noted that the members of each of these boards are appointed by the President to whom alone the administration of the act is confided; further, that no appeal from or other means of attacking the final orders of the National Bituminous Coal Labor Board is provided by code or act.

According to the averments of the bill, as amended, the plaintiffs, pursuant to the provisions of the code, submitted their controversy successively to the above-named boards, and each in its turn ruled against them. It will be noted that neither board saw fit, in order to determine the controversy, to order a secret ballot to be taken under its direction. This method was open to the boards, to be used "if necessary." Having exhausted their remedies before the said boards, may plaintiffs, being dissatisfied, turn to the courts for relief?

The rule is that, where a statute gives a new right and declares the remedy, any one seeking or relying on the right so given is confined for his remedy to that which is prescribed in the statute. 1 C. J. 988–990; Globe Newspaper Co. v. Walker, 210 U. S. 356, 28 S. Ct. 726, 52 L. Ed. 1096; French v. Willer, 126 Ill. 611, 18 N. E. 811, 2 L. R. A. 717, 9 Am. St. Rep. 651; D. R. Wilder Mfg. Co. v. Corn Products Co., 236 U. S. 165, 35 S. Ct. 398, 59 L. Ed. 520, Ann. Cas. 1916A, 118. The same rule would apply to a new right given by a code which, as here, has the force of law, where the code specifically declares the remedy. That it should apply to a code such as we have here seems apparent. By the provisions of the act, and strictly for the purposes of the emergency which the act is enacted to meet, the President is given power to approve, to refuse to approve, or to cancel the code by which alone the rights which plaintiffs here seek to have adjudicated are given life. The further power is conferred upon him to impose such conditions and exceptions upon the code as he may deem necessary to effectuate the policy declared in the act; also to prescribe such rules and regulations as may be necessary to carry out the purposes of the act. One of the purposes of the act is to effectuate the provisions for the benefit of employees required by section 7 (a) to be contained in every code, agreement, or license approved, prescribed, or issued under the act. To do this, in accordance with the authority conferred upon him, the President required the code to contain provisions in compliance with section 7 (a) of the act and required it to provide remedial and procedural means for the determination and settlement of the rights

so created and of the controversies concerning them by agencies to be set up by him. Undoubtedly one who seeks rights so given by the code must pursue the remedy so provided, and, unless other recourse is opened to him by the code or the act, he is confined to that remedy. Here, it must be conceded, no other recourse appears from the provisions of the act or the code unless it can be found in section 3 (c) of the act.

 Turning now to section 3 (c), in the light of the foregoing, is it probable, or reasonable to suppose that Congress intended thereby to confer upon the courts jurisdiction of private suits brought by persons dissatisfied with decisions of the labor boards to restrain, as violations of the code, the very acts which such boards, set up by the President for the determination of such questions, pursuant to the provisions of the code, have, after due and formal consideration, determined not to be violations? It would seem not. Though the question is not here involved, there may well be doubt as to whether it was intended that even the district attorneys in the name of the United States and under the direction of the Attorney General should be privileged to maintain suits to restrain, as violations of the code, acts which the boards provided by the code for the purpose, after due consideration, had declared not to be violations. Otherwise, industry, employers, and employees alike would be subjected to a state of uncertainty and to danger of a multiplicity of suits and prosecutions that would go far toward thwarting the practical administration of the act and code, as well as their purpose of aiding economic recovery.

In seeking the intention of Congress in using the language found in section 3 (c), the legislative and judicial history of the language is enlightening. It appears that, except for the differences made necessary to render them applicable in the respective statutes in which they are found, section 3 (c) of the National Industrial Recovery Act (15 USCA § 703 (c) and section 4 of the Sherman Anti-Trust Law (15 USCA § 4) are phrased in identical language. Each time the question came before the United States Supreme Court it was held, under the language used in section 4 of the Sherman Anti-Trust Law, that a private suit to restrain a violation of that law could not be maintained, but that such suits could only be maintained in the name of the United States by the district attorneys of the United States acting under the direction of the Attorney General. State of Minnesota v. Northern Securities Co., 194

U. S. 48, 24 S. Ct. 598, 48 L. Ed. 870; D. R. Wilder Mfg. Co. v. Corn Products Co., supra; General Investment Co. v. Lake Shore & Mich. S. R. Co., 260 U. S. 261, 43 S. Ct. 106, 67 L. Ed. 244; Paine Lumber Co. v. Neal, 244 U. S. 459, 37 S. Ct. 718, 61 L. Ed. 1256.

Since the Congress is deemed to have been cognizant of the foregoing decisions of the United States Supreme Court, it is reasonable to believe, in accordance with accepted rules of statutory construction, that, in the enactment of the National Industrial Recovery Act, the Congress must have deliberately adopted in section 3 (c) the language that had been used in section 4 of the Sherman Anti-Trust Law with the confident belief that its interpretation and application when used in the new act would be precisely that already given the same language by the United States Supreme Court in its interpretation of the Sherman Anti-Trust Law. Conceiving the intention of the Congress to have been as stated, and finding such construction to be in harmony with my understanding of the practical plan and purpose of the act, I am firmly of the opinion that section 3 (c) of the act authorizes suits to restrain violations of the codes approved under the act to be instituted and maintained only in the name of the United States by the United States district attorney of the proper district under the direction of the Attorney General, and that the jurisdiction given to United States District Courts by said section 3 (c) to restrain violations of the codes is available only in suits so instituted and maintained.

Turning to the federal authorities in which the courts have been called upon to construe section 3 (c) of the act, we find no decision by a court of appellate jurisdiction. It has been considered with obvious care, however, by three different District Courts, and the conclusion in each was in harmony with that which I have expressed herein. Purvis et al. v. Bazemore, 5 F. Supp. 230; Stanley v. Peabody Coal Co., 5 F. Supp. 612; Western Powder Mfg. Co. v. Interstate Coal Co., 5 F. Supp. 619. Two of said cases arose in this state and circuit at the suit of the present plaintiffs.

The fact that it may appear in those cases that before bringing suit the plaintiffs had not exhausted their remedies under the act does not weaken the decisions therein as authorities in support of the proposition that a private individual cannot maintain a suit for injunction under section 3 (c) of the National Industrial Recovery Act. Each of the de-

cisions seems flatly so to declare with supporting reasoning and authorities. In so far as the effect of the failure to exhaust remedies given by the act before bringing suit is discussed by Judge FitzHenry in Stanley v. Peabody Coal Co., supra, he declares general principles only, and his statements are not referable to any right to maintain a private suit under said section 3 (c), 15 USCA § 703 (c). On the latter point, after discussing at length the decisions of the United States Supreme Court with reference to the proper interpretation of section 4 of the Sherman Anti-Trust Law (15 USCA § 4) he said:

"From a consideration of the construction placed upon the precise words used in paragraph (c) of section 3 of the National Industrial Recovery Act, 15 USCA § 703 (c), when those words were used in section 4 of the Anti-Trust Act (15 USCA § 4), we are compelled to hold that a private individual cannot maintain a suit for an injunction under paragraph (c) of section 3." Opinion page 616 of 5 F. Supp.

Counsel insist that plaintiffs are entitled to maintain this suit by reason of the fact, averred in the bill, as amended, that both the labor boards to which they were compelled to submit their controversy were, in effect, parties to the alleged conspiracy to deprive the plaintiffs of their just rights under the said act and code, and the plaintiffs have been deprived of a fair hearing and trial of their rights. No authority has been submitted, however, to sustain a right to impeach the integrity of the final judgment of an administrative board, and set it aside, in a suit of this character without some specific statutory provision therefor. In the absence of some authority or statutory provision in support of the procedure being followed here, I must hold that such right does not exist.

Some reliance is placed by plaintiffs on the case of Texas & N. O. R. Co. v. Brotherhood of Railway Clerks, 281 U. S. 548, 50 S. Ct. 427, 74 L. Ed. 1034, wherein the United States Supreme Court sustained the jurisdiction of the District Court to enjoin a violation by the railroad company of the provision of the Railway Labor Act of 1926 (c. 347, 44 Stat. 577; U. S. C. tit. 45, §§ 151–163 [45 USCA §§ 151–163]) that representatives of employer and of employees should be chosen by the respective parties without interference, influence, or coercion on the part of the other. This decision is not applicable here for the reason that the Railway Labor Act created a right without supplying a remedy and for

that reason the injured parties were held entitled to enforce their rights under the statute through the United States District Court. Here the code, in compliance with requirements of the act, creates the right and also supplies the remedy.

Defendants' motion to dismiss plaintiffs' bill, as amended, for want of jurisdiction in the court to entertain the suit as brought and for want of proper parties plaintiff, is sustained, and said bill, as amended, is hereby dismissed.